# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

| | | |
|---|---|---|
| DIXIE EMERGENCY PHYSICIAN, LLC; CARPEN, PC; EMP, INC.; DOUGLAS MEDICAL PROVIDERS, INC.; NICHOLAS VETRANO, LLC; JEREMY PEPPER, MD, LLC; CHRISTINA COOLEY, M.D., LLC; DR. WILLIAM H. BARTON, III; DR. HILARY H. BEASON; DR. PHILLIP DOUGLAS; DR. WILLIAM SAMUEL HERRING; DR. CHRISTINA COOLEY KENTROS; DR. TIMOTHY BLAKE LOVELY; DR. CARSON PENKAVA; DR. JEREMY PEPPER; DR. ANGELYN RAMSEY; DR. CRISTI N. VAUGHN; DR. NICHOLAS VETRANO; ANGYRAMMD, INC.; DR. STEVEN T. COPPOCK; and DR. STEVEN BOBO; | | |
| | | Civil Action No.: 7:16-cv-01622-LSC |
| **Plaintiffs,** | | |
| v. | | |
| TEAM HEALTH, INC.; and PARAGON CONTRACTING SERVICES, LLC, F/K/A PARAGON CONTRACTING SERVICES, INC., D/B/A TEAM PRIMARY CARE PHYSICIANS OF ALABAMA, INC.; | | |
| **Defendants.** | | |

## FIRST AMENDED COMPLAINT

COME NOW the Plaintiffs, Dixie Emergency Physician, LLC, Carpen, PC, EMP, Inc., Douglas Medical Providers, Inc., Nicholas Vetrano, LLC, Jeremy Pepper, MD, LLC, Christina Cooley, M.D., LLC, Dr. William H. Barton, III, Dr. Hilary H. Beason, Dr. Phillip Douglas, Dr. William Samuel Herring, Dr. Christina Cooley Kentros, Dr. Timothy Blake Lovely, Dr. Carson Penkava, Dr. Jeremy Pepper, Dr. Angelyn Ramsey, Dr. Cristi N. Vaughn, Dr. Nicholas Vetrano, AngyRamMD, Inc., Dr. Steven T. Coppock, and Dr. Steven Bobo (collectively, "Plaintiffs"), and bring this First Amended Complaint (amended to add plaintiffs AngyRamMD, Inc., Dr. Steven T. Coppock, and Dr. Steven Bobo) to recover damages against the above-named Defendant, and for their causes of action would show unto the Court the following, to wit:

1.      Plaintiff Dixie Emergency Physician, LLC, is an Alabama limited liability company. Plaintiff Dr. Hilary H. Beason is its managing member.

2.      Plaintiff Carpen, PC, is an Alabama professional corporation. Plaintiff Dr. Carson Penkava is its President.

3.      Plaintiff EMP, Inc., is an Alabama corporation. Plaintiff Dr. William Samuel Herring is its President.

4.       Plaintiff Douglas Medical Providers, Inc., is an Alabama corporation. Plaintiff Dr. Phillip Douglas is its President.

5.     Nicholas Vetrano, LLC, is an Alabama limited liability company. Plaintiff Dr. Nicholas Vetrano is its managing member.

6.     Jeremy Pepper, MD, LLC, is an Alabama limited liability company. Plaintiff Dr. Jeremy Pepper is its managing member.

7.     Plaintiff Christina Cooley, M.D., LLC, is an Alabama limited liability company. Plaintiff Dr. Christina Cooley Kentros is its managing member.

8.     Plaintiff Dr. William H. Barton, III is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

9.     Plaintiff Dr. Hilary H. Beason is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

10.     Plaintiff Dr. Phillip Douglas is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

11.     Plaintiff Dr. William Samuel Herring is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

12.     Plaintiff Dr. Christina Cooley Kentros is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

13.     Plaintiff Dr. Timothy Blake Lovely is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

14.     Plaintiff Dr. Carson Penkava is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

15.     Plaintiff Dr. Jeremy Pepper is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

16.     Plaintiff Dr. Angelyn Ramsey is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

17.     Plaintiff Dr. Cristi N. Vaughn is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

18.     Plaintiff Dr. Nicholas Vetrano is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

19.     Plaintiff AngyRamMD, Inc., is an Alabama corporation. Plaintiff Dr. Angelyn Ramsey is its President.

20.     Plaintiff Dr. Steven T. Coppock is over the age of nineteen (19) years, and is a resident of Tuscaloosa County, Alabama.

21.     Plaintiff Dr. Steven Bobo is over the age of nineteen (19) years, and is a resident of Jefferson County, Alabama.

22.     Upon information and belief, Defendant Team Health, Inc. (hereinafter "Team Health") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. Team Health was doing business in the State of Alabama at all times material herein.

23.     Upon information and belief, Defendant Paragon Contracting Services, LLC, f/k/a Paragon Contracting Services, Inc., d/b/a Team Primary Care Physicians

of Alabama, Inc. (hereinafter "Paragon") is a Florida limited liability company with its principal mailing address in Knoxville, Tennessee. Paragon was doing business in the State of Alabama at all times material herein. Upon information and belief, Paragon operates under Team Health's dominion and control and at Team Health's direction.

## JURISDICTION AND VENUE

24.     This case is properly brought in the Tuscaloosa County Circuit Court pursuant to § 6-3-7(a), Code of Alabama (Amd. 1999), and § 12-11-30(1), Code of Alabama (Amd. 2015), due to the fact that the incident made the basis of this suit occurred in Tuscaloosa County, Alabama, and the matter in controversy exceeds TEN THOUSAND DOLLARS ($10,000).

## STATEMENT OF FACTS

### A.   Background

25.     Defendants contract with physicians, such as Plaintiffs, to handle emergency care at the DCH Regional Medical Center in Tuscaloosa, Alabama, and Northport Medical Center in Northport, Alabama (both hospitals are part of the DCH Health System and are collectively referred to as "DCH"). Because Defendants signed an exclusive contract with DCH, emergency care physicians cannot contract with the hospital directly. The physicians must contract with Defendants in order to work in the DCH emergency room.

26.     Under Paragon's contracts with DCH and Plaintiffs, Defendants makes money based on the patients each physician is responsible for during his or her shift and the services provided to each patient. If a physician is unproductive while on duty, Defendants makes less money on that physician, but if a physician is industrious and takes on responsibility for more patients, Defendants makes more money.

## B.    The RVU Bonus Program

27.     In 2014, Defendants sought to add a bonus program to the contracts of the physicians at DCH in order to incentivize the physicians to take on responsibility for more patients during each shift so Defendants could bill more and make more money. This program was also motivated by the need to attract and retain physicians to DCH and the Tuscaloosa market, where it is more difficult to get physicians to come work than a larger metropolitan area, and was presented to the physicians as a way for them to make more money as well.

28.     Defendants' system relies on "relative value units" ("RVUs") to determine the amount of each physician's bonus. RVUs assign a value to each service provided and the resources used to provide that service. The RVUs used by Defendants are based on a similar system initially set up by Medicare to help it determine how much it will reimburse healthcare providers when the provider bills Medicare for services.

29.    Plaintiffs and the other physicians, however, were concerned about the program because it required them to agree to give up an existing bonus program that was not based on physician productivity, but rather on such administrative functions as attendance at meetings, the requirements of which were easy to satisfy.

30.    Defendants allayed their fears by explaining that they would get RVU credit for their own services performed directly and for the services performed by physician assistants and nurse practitioners (collectively referred to as "advanced practice clinicians" or "APCs") working under their direction during each shift. Moreover, Defendants made clear that the physicians got paid for every RVU earned, regardless whether Defendants were compensated by the entity billed for the services.

31.    As Marcia Stiles-Lucas, Vice President of Client Services for Defendants, explained to the physicians: "Your RVUs come from what is billed — not collected. … **You are also getting the RVUs for all records you see or supervise with an APC. … [Y]ou can't lose RVUs**." (Emphasis added.)

32.    When all of these RVU credits were added together, Defendants assured the physicians that they would end up making more money, even though they were giving up a nearly automatic administrative bonus. Defendants showed the physicians financial projections based on actual numbers and historical data demonstrating that the RVU bonus, including assisting RVUs (generated by

advanced practice clinicians operating under the physician's direction), exceeded the income received under the old bonus system.

33.     Although an advanced practice clinician might see a patient, the physician could still be held responsible for the service provided to the patient. For that reason, when Defendants were pitching the RVU bonus program, Plaintiffs wanted assurances that they would receive credit for work performed by advanced practice clinicians operating under their direction.

34.     Defendants specifically represented to Plaintiffs in writing beforehand as part of the sales pitch, in the contracts themselves, and afterwards, that Plaintiffs would be paid RVUs earned by assisting and supervising the advanced practice clinicians.

## C.   The Contracts

35.     Based on these assurances, Plaintiffs agreed to the RVU bonus program and signed new contracts or addendums to old contracts giving up the old nearly automatic administrative bonus and switching to the new RVU bonus program.

36.     The contracts make clear that the physicians received RVU bonus credit for work performed by advanced practice clinicians they oversaw during each shift, stating:

> At the end of each calendar month (a "Month"), during the term of this Agreement, Company shall, with respect to the Emergency Department at DCH Regional Medical Center, determine, in its sole

discretion and in accordance with its accounting procedures, the total relative value units ("Total RVU's") generated by Professional during Company's billing cycle associated with that Month (the "Billing Cycle") **including Total RVU's attributable to Company's nurse practitioners and/or physician assistants while providing their services under Professional's direction** during that Billing Cycle (collectively, "Professional's Total RVU's"). For purposes of this Agreement, relative value units ("RVU's") shall be based on Medicare Relative Value Units.

(Taken from one of the plaintiffs' contracts, but all have similar or identical language) (emphasis added)).

37.    Although the contracts allowed Defendants the discretion to use their own methods and accounting procedures for counting the RVUs, the contracts required the Defendants to count assisting RVUs. Moreover, once RVUs were counted, Defendants were required to pay Plaintiffs any bonus earned.

38.    Subsequent addendums were even more clear, explaining in more detail who was considered to be working under a physician's direction:

Determine the total Relative Value Units ("Total RVU's") generated by Professional in the Emergency Department at DCH ("Professional's Total RVU's") during Company's billing cycle that ended in the last preceding Month (the "Prior Billing Cycle"). In the event Company and/or Company's affiliate supplies nurse practitioners and/or physician assistants in the Emergency Department at DCH, **Professional's Total RVU's shall include Total RVU's attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle**. For purposes of this Agreement, the term "Relative Value Unit" shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT

Code, which number was in effect at the time the service was provided.

(Taken from an addendum to one of the plaintiffs' contracts) (emphasis added).

### D.   Assisted RVUs Explained

39.    The importance of physician credit for Assisted RVUs is best understood in the context of patient charts. A physician is responsible for every patient whether he or she sees the patient directly or whether he or she supervises an advanced practice clinician's treatment plan. Every patient chart requires a physician to sign his or her name attesting to the fact that he or she is taking personal responsibility for the patient's treatment.

40.    If the physician sees the patient directly, he or she must commit to the following attestation in the patient's chart:

> I personally evaluated and examined the patient in conjunction with the MLP [("Mid Level Provider")] and agree with the assessment and treatment plan and disposition of the patient as recorded by the MLP.

41.    When an advanced practice clinician sees a patient under the physician's direction, the physician is responsible for the patient's diagnosis and treatment and either works with the advanced practice clinician to formulate a treatment plan, or if the advanced practice clinician has already created a treatment plan, the physician reviews and makes changes to the plan to make sure it is

appropriate. In this situation, the physician must commit to a second attestation that reads as follows:

> I was personally available for consultation in the emergency department. I have reviewed the chart and agree with the documentation as recorded by the MLP, including the assessment, treatment plan and disposition.

42.     The physician must attest to the preceding on every patient chart where he or she assisted the advanced practice clinician but did not see the patient directly.

43.     Whether the physician personally sees the patient or not, the charts and attestations therein, as well as the contracts discussed above, all recognize that the physician takes on considerable responsibility for every patient's diagnosis, treatment, and disposition, and spends significant amounts of time assisting those patients through consultation with the advanced practice clinicians and review of the patient charts.

44.     When the physician does not see a patient personally, the contracts require that the physician receives credit for all of this additional work on the patient's behalf through the RVU bonus for the RVUs "attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle." Defendants refer to these RVUs as "Assisted RVUs."

### E.   Defendants' Deception

45.     Each month, Defendants provide Plaintiffs with an RVU scorecard showing the total RVUs earned each month. Each physician was given the RVUs of all other physicians as a way to motivate those with lower numbers to work harder to avoid being embarrassed in front of their peers.

46.     Because the scorecard RVU numbers were reported to Plaintiffs by Defendants, Plaintiffs believed the numbers were accurate and served as the basis for their RVU bonuses. However, Plaintiffs could not verify this because the pay period was offset half of a month from the RVU scorecard reporting period. The scorecard counted RVUs from approximately the 16th of one month to the 15th of the following month, but the pay period is from the 1st to the end of each month.

47.     Soon after implementation of the RVU bonus program, Plaintiffs began to suspect that they were not being compensated for all of the RVUs Defendants reported to them on the scorecard because paychecks were less than expected. When Plaintiffs questioned Defendants regarding the RVU numbers, Defendants initially blamed the suspected difference on the two-week offset between the data in the paychecks and the RVU scorecard. Because the number and timing of shifts can vary significantly from week to week, the RVU scorecard data can be significantly different from the paycheck data when only half the data set overlaps. Defendants indicated that all RVUs were being credited in the bonus when you adjust for the

two-week offset. However, this very offset is also what made it impossible for Plaintiffs to accurately compare the paycheck bonus with the RVU scorecard themselves.

48.     For nearly 28 months, Plaintiffs sought information and the underlying data so that they could confirm that all RVUs counted on the scorecard were being credited in the bonus. Defendants initially stonewalled but eventually provided enough data that Plaintiffs were able to determine that Defendants, in direct contravention of the contracts and amended contracts signed by each Plaintiff, might be subtracting out RVUs attributable to advanced practice clinicians who were providing services under the physician's direction.

49.     Even though Defendants initially represented to Plaintiffs that they were being paid for all RVUs credited to them on the RVU scorecard, Defendants recently admitted for the first time that they were subtracting out assisting RVUs from the Total RVUs.

## COUNT ONE
## BREACH OF CONTRACT

50.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

51.     Plaintiffs each entered into a valid contract binding on the parties.

52.     Plaintiffs performed under the contracts serving patients in the emergency room at DCH for all or part of the preceding two years.

53.     Plaintiffs earned RVU bonus under the terms of the contracts that Defendants failed to pay.

54.     As a proximate result, Plaintiffs were damaged.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including legal fees and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT TWO
## FRAUD IN THE INDUCEMENT

55.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

56.     Defendants had a duty to speak the truth but represented to Plaintiffs that they would receive bonus credit for all RVUs generated by Plaintiffs, including total RVU's attributable to advanced practice clinicians while providing their services under Plaintiffs' direction.

57.     The crediting of assisting RVUs to each Plaintiff was a material fact inducing each one to sign a contract and join Defendants' staff or sign an addendum to an existing contract and remain on Defendants' staff.

58.     Plaintiffs reasonably relied on Defendants' explanation that RVUs included assisting RVUs to their detriment and signed each contract or addendum.

59.     Defendants' statement was an intentional, reckless, or innocent misrepresentation.

60.     As a proximate result of Defendants' misrepresentation, Plaintiffs were damaged.

61.     Upon information and belief, Defendants' misrepresentations are part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT THREE
## PROMISSORY FRAUD

62.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

63.     Defendants had a duty to speak the truth but misrepresented to Plaintiffs that they would receive bonus credit for all RVUs generated by Plaintiffs, including

total RVU's attributable to advanced practice clinicians while providing their services under Plaintiffs' direction.

64.     This misrepresentation was a material fact reasonably relied upon by each Plaintiff to sign a contract and join Defendants' staff or sign an addendum to an existing contract and remain on Defendants' staff. This misrepresentation was also a material fact reasonably relied upon by each Plaintiff in remaining on Defendants' staff.

65.     As a proximate result of Defendants' misrepresentation, Plaintiffs were damaged.

66.     At the time Defendants promised to pay for supervised RVUs, Defendants intended to deceive Plaintiffs and intended not to pay.

67.     Upon information and belief, Defendants' misrepresentations are part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT FOUR
## FRAUD/MISREPRESENTATION

68.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

69.     Defendants had a duty to speak the truth but intentionally, recklessly, or innocently misrepresented to Plaintiffs the following:

    a.  That they were receiving credit for all RVUs in their bonuses;

    b.  That the RVU scorecard accurately reflected the RVUs on which their bonuses were based;

    c.  That the RVU bonus included credit for supervising RVUs; and

    d.  That the only reason the RVUs on which the paycheck bonus was based did not match the RVUs listed on the scorecards was because the bonus was based on a middle of the month data set and the scorecard was based on a calendar month data set.

70.     In reliance on these misrepresentations, Plaintiffs chose to stay with Defendants even though they could have terminated their contracts with 90-days notice and took responsibility for more patients seen by advanced practice clinicians to their detriment, while Defendants substantially increased their profitability, even though Defendants now deny them credit for doing so.

71.     As a proximate result of Defendants' misrepresentations, Plaintiffs were damaged.

72.     Upon information and belief, Defendants' misrepresentations are part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT FIVE
## FRAUDULENT SUPPRESSION

73.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

74.     Defendants had a duty to disclose the RVUs used to calculate Plaintiffs bonuses under the contract.

75.     Defendants knew that it was excluding some RVUs from the RVU bonuses but hid this fact from Plaintiffs.

76.     As a result of this suppression, Plaintiffs chose to stay with Defendants even though they could have terminated their contracts with 90-days notice and took responsibility for more patients seen by advanced practice clinicians to their detriment, while Defendants substantially increased their profitability, even though Defendants now deny them credit for doing so.

77.     As a proximate result of Defendants' misrepresentations, Plaintiffs were damaged.

78.     Upon information and belief, Defendants' suppression is part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT SIX
## UNJUST ENRICHMENT

79.     Plaintiffs re-allege all of the allegations in the preceding paragraphs as if set out in full herein.

80.     Defendants knowingly, intentionally and fraudulently accepted and retained a benefit from Plaintiffs.

81.     Plaintiffs had a reasonable expectation of being compensated for the benefit conferred on Defendants.

82.     Defendant knowingly, intentionally and fraudulently failed to compensate Plaintiffs for the benefit conferred.

83.     As a proximate result, Plaintiffs were damaged.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

*s/ Daniel B. Snyder*
Floyd D. Gaines
Daniel B. Snyder

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES RAISED HEREIN.**

*s/ Daniel B. Snyder*
Floyd D. Gaines
Daniel B. Snyder

OF COUNSEL:
GAINES LLC
2160 Highland Avenue South, Suite 101
Birmingham. AL 35205
fgaines@gainesllc.com
dsnyder@gainesllc.com
Office Number:           205.598.5055
Fax Number:              205.598.5066
Floyd Gaines Direct:     205.598.5089
Daniel Snyder Direct:    205.598.5076

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing through the Clerk of the Court, using the CM/ECF system, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail or hand delivery, on December 2, 2016:

William G. Somerville
Andrew P. Walsh
DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
420 20th Street North Wells Fargo Tower, Suite 1400
Birmingham, Alabama 35203
Tel: 205-328-0480
Fax:  205-322-8007

*s/ Daniel B. Snyder*
OF COUNSEL